IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RUBEN PEDRAZA-BUCIO,<br><br>Defendant. | ORDER AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:08 CR 698 (TC) |

Defendant Ruben Pedraza-Bucio seeks to suppress evidence obtained by law enforcement during a traffic stop  Mr. Pedraza makes several arguments in support of his motion: First, that the stop was unjustified at its inception; second, that law enforcement exceeded the scope of the traffic stop; and third, that his consent to search the car was invalid.  But the court concludes that the stop and the search of Mr. Pedraza's car were lawful and denies the Motion to Suppress.

**FINDINGS OF FACT**

**The Stop**

Deputy Michael Mays of the Salt Lake County Sheriff's Office responded to a dispatch call on October 2, 2008, seeking patrol assistance for a narcotics unit.  Once Deputy Mays made contact with the narcotics unit on his radio, he learned that the narcotics officers wanted him to conduct a "wall stop" of a car they had been following.[1]  The narcotics unit provided Deputy

---

[1] Although a "wall stop" is based on a legitimate traffic violation, it is motivated by the underlying belief that some sort of contraband is likely located in the car.  "The term 'wall stop' is based on the theory that there is a wall between the stopping officers and the investigators who

1

Mays with the make, model and plate number of the car.  Although the car was of interest to the narcotics unit, Deputy Mays knew he couldn't just pull it over," but that he "had to follow the exact same rules [he] would on any car that [he] would pull over."  (Transcript (Tr.) of Hearing on January 16, 2008, 7-8.)  Deputy Mays understood that he had to develop an independent and valid reason for stopping the car.

Shortly thereafter,  Deputy Mays recognized the make, model and plate of a passing car as matching the description of the car by the narcotics unit.  He began to follow the car.  After a few blocks, the car moved into the left turn lane and stopped at the red light at the intersection of 4800 West and 5400 South.  After the light turned green and as the car was executing a left turn onto 4800 West, it "left the roadway off the right fog lane.  Both tires went into the gutter and went over a grade, kind of storm drainage ditch, and then the tires nearly hit the curb."[2]  (Tr. 9.)  Deputy Mays turned on his overhead police lights and signaled for the car to stop, which it promptly did.

Deputy Mays approached the car on the driver's side and, speaking in English, identified himself and explained to the driver (who was later identified as the Defendant Ruben Pedraza-Bucio) that he was being stopped for unsafe lane travel. Mr. Pedraza was alone in the car.  Deputy Mays asked Mr. Pedraza  for a driver's license, valid registration and proof of insurance.

---

give the tip to the stopping officers.  Essentially, the investigators have 'handed off' the information to the stopping officers.'"  Ken Wallentine, Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders 61 (2007).

[2]Deputy Mays testified that the fog lane was about three to four feet from the curb.  Mr. Pedraza does not challenge whether Deputy Mays had a reasonable articulable suspicion of a traffic violation.  See generally United States v. Alvarado, 430 F.3d 1305, 1309 (10th Cir. 2005) ("Under the particular facts and circumstances of this case, where there is an utter absence of any weather conditions, road features or other circumstances that could have interfered with [the driver's] ability to keep his vehicle in a single lane," the trooper "had reasonable articulable suspicion that [the driver], by crossing one foot over the fog line, had violated [a Utah statute].")

Mr. Pedraza told Deputy Mays, in English, that the car belonged to a friend. He gave Deputy Mays the requested documentation for the car and a photo identification from Mexico in the name "Ruben Pedraza."[3] Mr. Pedraza did not give Deputy Mays a driver's license.

Deputy Mays filled out a traffic citation form. He returned to his police car and verified the registration and insurance on the car to make sure that it had not been stolen. Using various law enforcement and driving records databases, he entered the name and birth date Mr. Pedraza had given him but could not find either a valid driver's license or a definite identification for Mr. Pedraza. Deputy Mays then decided to get an address, phone number, and a thumbprint from Mr. Pedraza "so at least from that point on . . . if I plugged in that name . . . we [would] have . . . a correct address to where a citation [would] be mailed to or if we needed to get in contact with him, and a fingerprint for future identification." (Tr. 16:22-17:2.)

Deputy Mays walked back to Mr. Pedraza's car and asked him in English where he lived. Mr. Pedraza pointed east. When Deputy Mays said that needed an actual address, Mr. Pedraza said that he had recently moved to a rental property and that he did not know the exact address. Mr. Pedraza offered to call someone with access to the lease papers so that he could get the exact address.

While Deputy Mays waited in his patrol car, Mr. Pedraza made a call on his own cell phone, presumably to find the address of the rental property. In a moment, he gave the phone to

---

[3]At some point during the stop, Mr. Pedraza told Deputy Mays that his English skills were poor, although he "never said [that] he didn't speak English." (Tr. 34:19.) Deputy Mays testified during the evidentiary hearing that based on the responses provided, Mr. Pedraza seemed to comprehend the questions posed. For example, Deputy Mays testified that for the "first couple of minutes of the stop, I didn't know there was a language barrier. I mean it was going fine. . . . I asked where are you going, where are you coming from. My friend's. Where do you live. Down there. You know, those were a couple of word in English." (Tr. 34:11-34:15.) Officer Brown testified that she had "heard the interaction between Deputy Mays and Mr. Pedraza showing there was some confusion with English and Spanish." (Tr. 44:16-44:18.)

Deputy Mays who spoke with an unidentified man who gave him an address. It was located on Highland Drive in Kearns, Utah. This address was west from where Mr. Pedraza and the Deputy were stopped, not east as Mr. Pedraza had said.

At this time, Officer Richelle Brown with the Salt Lake City Police Department arrived with her drug dog.[4] For approximately three to four minutes, Officer Brown and the dog circled the car and when the dog had finished its work, Officer Brown returned the dog to her police car.[5] Officer Brown put her dog back in her own unmarked car.

Deputy Mays got out of his car with the traffic citation form in hand and called Mr. Pedraza to the back of his car. Deputy Mays explained the nature of the citation to Mr. Pedraza and asked that he place his thumbprint on the form, a standard procedure when a driver's identity cannot be confirmed. As Deputy Mays issued the traffic citation, Officer Brown came out of her car to stand behind him for safety reasons.

Deputy Mays returned all of Mr. Pedraza's documents and explained in English that Mr. Pedraza was free to leave and that the traffic stop was over. (The entire stop had lasted about fifteen to twenty minutes, which based on Deputy Mays's experience, was fairly typical.)

**The Search**

After Deputy Mays returned Mr. Pedraza's documents and gave him the citation, Deputy Mays started to walk back to his patrol car. Officer Brown approached Mr. Pedraza. Initially in

---

[4]Officer Brown had received a telephone call requesting her to conduct a dog search of a car at a traffic stop. When she received the call, Officer Brown had just arrived at a restaurant in downtown Salt Lake City to have lunch. Officer Brown immediately walked out of the restaurant, got in her car, and drove to the location of the stop, which she estimates took about twenty minutes.

[5]Because the United States contends that the search of the car was conducted pursuant to Mr. Pedraza's consent, the parties agreed that the dog's conduct would not be considered. The court allowed testimony regarding the dog and its conduct at the evidentiary hearing and refers to it here only to the extent that it helps to tell the story.

English, she asked Mr. Pedraza if she could search his car with her dog. Although Officer Brown has only a minimal knowledge of Spanish, she then said to him "me perro into carro, which basically [means] dog in car." (Tr. 44:18-44:19.) Mr. Pedraza testified at the evidentiary hearing that he understood that Officer Brown was asking him if she could search his car.

   Officer Brown handed Mr. Pedraza a search consent form written in both English and Spanish. Officer Brown and Deputy Mays observed Mr. Pedraza follow the lines of the text on the form with his finger as he read. As he was reading, Mr. Pedraza "had a couple of questions on some of the blanks spaces that he was to fill in." (Tr. 45:4-45:6.) Mr. Pedraza would point at one of the blank spaces, look at Officer Brown, and she would supply him with the necessary information. Officer Brown answered him in English and would use what Spanish words she could if he did not seem to understand.

   Mr. Pedraza printed his name on the form. Because Mr. Pedraza did not know the color, year, make or model of the car or the license plate, Officer Brown filled in that information for him. Finally, Mr. Pedraza signed and dated (Officer Brown told him the date) the search consent form.

   Officer Brown asked Mr. Pedraza to sit on the park strip near Deputy Mays's car once the search consent form was signed. From where he was seated, Mr. Pedraza could watch Officer Brown as she searched his car without being an immediate threat to officer safety. Deputy Mays stayed with Mr. Pedraza while Officer Brown conducted the search. At no point did Mr. Pedraza indicate to Deputy Mays or Officer Brown that he wanted to withdraw his consent. Officer Brown found eight ounces of methamphetamine in Mr. Pedraza's car.

## ANALYSIS

**The Initial Stop**

Mr. Pedraza argues that the stop was not justified at its inception because the narcotics unit had requested that Deputy Mays follow Mr. Pedraza. He does not challenge whether Deputy Mays actually observed a traffic violation, but contends instead that the stop was illegal as a result of the subjective intentions of law enforcement.

Routine traffic stops are governed by the principles of investigative detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968). As an initial matter, a court must consider whether law enforcement stop of a car is "'justified at its inception.'" United States v. Winder, 557 F.3d 1129, 1133 (10th Cir. 2009) (quoting United States v. Valenzuela, 494 F.3d 886, 888 (10th Cir. 2007)). A traffic stop is justified at its inception if an officer has "probable cause to believe a traffic violation has occurred" or "a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." Id. at 1134; see also United States v. Edgerton, 438 F.3d 1043, 1047 (10th Cir. 2006); United States v. Patterson, 472 F.3d 767, 775 (10th Cir. 2006).

The Tenth Circuit has long rejected the "notion that an officer's subjective motivations in effecting a stop are relevant to the Terry analysis." Winder, 557 F.3d at 1134; see Whren v. United States, 517 U.S. 806, 813 (1996) ("The trooper's subjective intent or good faith do not affect the reasonableness of the stop."); see also United States v. Chavez, 534 F.3d 1338, 1344 (10th Cir.2008) ("[T]he officer's subjective motives are irrelevant."); United States v. DeGasso, 369 F.3d 1139, 1143 (10th Cir.2004) (same); United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (same). Instead a court is to consider only "whether the stop was 'objectively' justified." Chavez, 534 F.3d at 1344.

Here, Deputy Mays made the traffic stop once he saw Mr. Pedraza commit a traffic violation as described above. Accordingly Deputy Mays' initial stop was lawful.

### The Scope of the Stop

Mr. Pedraza argues that Officer Brown impermissibly exceeded the scope of the traffic stop when she asked for consent to search his car. He argues that neither probable cause nor articulable suspicion justified continuing the stop.

"[B]oth the length and scope of a traffic stop are relevant factors in deciding whether the stop comports with the Fourth Amendment." United States v. Stewart, 473 F.3d 1265, 1268 (10th Cir. 2007). A traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and must last no longer than is necessary to effectuate the purpose of the stop. Chavez, 534 F.3d at 1343; see also United States v. Cervine, 347 F.3d 865, 870-71 (10th Cir. 2003); United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001). Absent a driver's consent, this means that an officer "ordinarily may not do more than ask to see a driver's license and registration and insurance documents, run a computer check on the car and driver, inquire about the driver's travel plans, and write out a citation." United States v. Vazquez, 555 F.3d 923, 928 (10th Cir. 2009); see also Cervine, 347 F.3d at 871.

But a traffic stop may become consensual if "the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." United States v. Villegas, 553 F.3d 894, 898 (10th Cir. 2009) (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)). Whether an encounter becomes consensual "'depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'" Id. (quoting West, 219 F.3d at 1176).

Here Deputy Mays took about fifteen to twenty minutes to conduct the traffic stop, not an unusually long amount of time.  During the entire encounter, Deputy Mays was busy running various computer searches, completing documents, and trying to verify Mr. Pedraza's identity and address.  Moreover, the dog inspection did not add to the time of the detention because Deputy Mays was completing documents throughout that time.

Officer Brown approached Mr. Pedraza to ask for consent to search his car only after Mr. Pedraz had been given all his documents and told he could leave.  Neither Officer Brown nor Deputy Mays did anything to restrain Mr. Pedraza.  On the contrary, Officer Brown was polite and pleasant at all times with Mr. Pedraza.

Based on the above,  the court concludes that the traffic stop was not unreasonably extended.  Once Deputy Mays returned all documents and informed Mr. Pedraza that the stop was over and that he was free to leave, the interaction between the officers and Mr. Pedraza was consensual.

### Consent for the Car Search

Finally, Mr. Pedraza argues that his consent allowing law enforcement to search his car was invalid.  First, Mr. Pedraza argues that because he does not understand English, he did not understand Officer Brown when she asked him to search the car.  Second, Mr. Pedraza contends that because he has little formal education and reads Spanish only with difficulty, he did not understand the search consent form.  Finally, Mr. Pedraza contends that his consent was not valid because the officers did not tell him that he did not have to consent to the search and that he could withdraw his consent at any time.

"[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable

cause to support the search." United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008). If a search is conducted pursuant to an individual's consent, that consent must be voluntary. United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). The government bears "the burden of proving voluntary consent based on the totality of the circumstances." United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005). Whether consent was voluntary "is a fact-laden inquiry, depending heavily on the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Cardenas-Alatorre, 485 F.3d 1111, 1118 (10th Cir. 2007) (internal quotations omitted).

  The court first considers the impact of Mr. Pedraza's difficulty with the English language on the voluntary nature of his consent. When considering the validity of consent given by someone who is not fluent in English, a court need only consider whether the evidence demonstrates that the individual has a "sufficient familiarity" to be able to "understand and respond." United States v. Zubia-Melendez, 263 F.3d 1155, 1163 (10th Cir. 2001); see also United States v. Pulido-Vasquez, No. 07-3105, 2009 WL 323138 (10th Cir. Feb. 10, 2009) (concluding "working knowledge" is required and finding no clear error in factual determination that defendant had sufficient familiarity with English to consent to search); United States v. Corral, 899 F.3d 991, 994-95 (10th Cir. 1990) (affirming district court where record demonstrated that defendant had consented to the search and had a working knowledge of English).

  Here, Deputy Mays testified at the evidentiary hearing that when he first approached the car after initiating the traffic stop, he spoke to Mr. Pedraza exclusively in English. Mr. Pedraza's demonstrated ability in English was sufficiently good such that Deputy Mays said that he was

unaware that any language barrier existed for the first few minutes of the encounter.  Throughout the rest of the encounter, Mr. Pedraza was sufficiently familiar with English to be able to understand and respond to requests from law enforcement.  Mr. Pedraza's was able to explain in English that the car belonged to a friend.  As requested, he provided Deputy Mays with the car's documentation and his Mexican identification.  When Deputy Mays said that he needed the exact address of a residence, Mr. Pedraza was able to understand enough to volunteer that he could call someone with access to the information.  After Mr. Pedraza made the initial call, Deputy Mays spoke to the person on the phone in English.  That person was already aware of the circumstances of the stop and what Deputy Mays needed.  And at the end of the traffic stop, Mr. Pedraza knew enough English to understand directions to place his thumbprint on the citation form.  Moreover, Officer Brown said that after she witnessed some confusion, she tried to supplement her English with rudimentary Spanish.  For example, after initially asking in English, she asked Mr. Pedraza if she could search his car by saying "dog in car" in Spanish.  (Tr. 44:18-44:19.)  Mr. Pedraza testified at the evidentiary hearing that he understood that Officer Brown had asked him if she could search the car.  Considering this evidence, the court concludes that Mr. Pedraza's working knowledge of English was sufficient such that was he was able to understand and to respond to Deputy Mays and Officer Brown.

Second, the evidence further establishes that Mr. Pedraza was sufficiently able to read and write in Spanish to render his consent voluntary.  After asking Mr. Pedraza in both English and Spanish to search his car, Officer Brown gave Mr. Pedraza a copy of a search consent form written in Spanish and English.  Mr. Pedraza does not dispute the validity of the form, but argues that he could not read or understand the form considering his elementary reading and writing skills in his native language.  Both Officer Brown and Deputy Mays testified that they watched

Mr. Pedraza follow the lines of the consent form with his finger as he read.  Mr. Pedraza asked Officer Brown questions about the form, wrote his name on the form and signed it.  During the evidentiary hearing, Mr. Pedraza demonstrated that he was sufficiently able to read Spanish to understand the nature of the search consent form.  For example, Mr. Pedraza read in Spanish the following highly relevant excerpt: "I, Ruben Pedraza, through this document give consent to the officers . . . to search the following vehicle described . . ." (Tr. 58:22-58:24.)  Mr. Pedraza testified that this language meant "some things for them to search the car." (Tr. 59:18.)  Even without considering Mr. Pedraza's credibility issues, his own testimony demonstrates at a minimum that he had a sufficient understanding of written Spanish for his consent to be voluntary.

      Finally, Mr. Pedraza's argument that his consent was invalid when law enforcement allegedly failed to advise him that he could refuse to continue the encounter with law enforcement and that he could withdraw consent at any time is without merit.  Even assuming that what Mr. Pedraza says is true, case law in this jurisdiction is clear.  Law enforcement is not required to advise individuals that they do not have to consent or that they may terminate consent once it is given.  See, e.g., United States v. Marquez-Diaz, No. 07-2014, 2009 WL 826840 *9 (March 31, 2009) (explaining in case involving a consent to search form that an officer has no obligation to explain that a defendant may leave and need not respond to questioning); Gregoire, 425 F.3d at 879 ("[T]here is no requirement that law enforcement advise as to the precise subject of the additional questioning or that a citizen may terminate the encounter."); United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005)("An officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave."); West, 219 F.3d at 1176-77 (same).  Mr. Pedraza does not point to any precedent that would compel a different

11

conclusion.

Based on the totality of circumstances, the court concludes that Mr. Pedraza's consent allowing the officers to search his car was completely voluntary.

## ORDER

For the reasons explained, Mr. Pedraza's Motion to Suppress is DENIED. (Docket No. 18.)

DATED this 23rd day of April 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge